# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 26, 2013

## STATE OF TENNESSEE v. WILLIAM E. BLAKE, JR.

**Appeal from the Criminal Court for Knox County**
**No. 86246     Bob R. McGee, Judge**

---

**No. E2012-02268-CCA-R3-CD - Filed September 6, 2013**

---

A jury convicted the defendant of second degree murder, aggravated assault, and possession of a handgun after having been previously convicted of a felony drug offense. The defendant was sentenced as a Range II, multiple offender to thirty-five years for the homicide, six years for the aggravated assault, and four years for the weapons possession. The trial court elected to impose the aggravated assault conviction consecutively to the homicide conviction for an aggregate sentence of forty-one years. The defendant appeals, asserting that the evidence was insufficient to support the jury's finding of the *mens rea* element of second degree murder; that the trial court erred in allowing evidence of prior felony drug convictions to be introduced as impeachment; and that the trial court improperly imposed a consecutive sentence. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, and ROGER A. PAGE, JJ., joined.

Steve Sams and J. Liddell Kirk (at trial) and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, William E. Blake, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL AND PROCEDURAL HISTORY

The offenses at issue occurred as the result of an argument that developed during a card game hosted by the defendant at a friend's home. After a verbal altercation with one of the guests, the defendant left the premises. The defendant returned shortly, and the shooting victim, Nicholas Gillis, who lived in the home, approached the defendant about the previous argument. The defendant ultimately shot the victim three times, once in the lower leg, once in the arm, and once in the face. The defendant testified that he was acting in self-defense and did not shoot directly at the victim. On his way out of the home, the defendant brandished his weapon at another guest.

Prior to trial, the State provided written notice to the defendant of its intent to impeach him with four prior felony convictions – three drug offenses and one weapons possession – should he elect to testify. The trial court heard the parties on the issue prior to voir dire and found that all four convictions could be introduced as impeachment, noting that because they were felonies, the crimes were automatically admissible and the court was not required to weigh the probative value against unfair prejudice. However, prior to the beginning of proof but after the selection of the jury, the trial court *sua sponte* raised the issue again, noting that it had erroneously declared it did not need to balance the probative value against the prejudicial effect. The trial court then found that the weapons possession was similar to the crimes for which the defendant was on trial and concluded that its admission would be unfairly prejudicial. However, the trial court came to the opposite conclusion about the drug convictions: "With regard to the drug convictions, this Court would be of the opinion that selling drugs, purporting to get people high, knowing full well that they're very dangerous and destructive substances would amount to a dishonest act, and we'll allow the State to prove those convictions."

The shooting took place at the home of Kimberly Booker. Ms. Booker testified that she had known the defendant for fifteen to twenty years and that he had been a daily visitor to her home. In January 2007, Ms. Booker was in a relationship with the victim, who was also a very close friend of the defendant. Ms. Booker lived with her two children and the victim.

The defendant had asked Ms. Booker if he could run a game of Tonk, a card game played for money, at her house on January 31, 2007. The defendant was expected to bring food or drinks, play the role of the "house," set the rules, and take a share of the profits. The defendant did not provide food or set the rules, but he brought some players and the game commenced. Ms. Booker's daughter Nakia Beckley was upstairs with Debra Mills. After the game began, the victim arrived with his cousin Jamar Gillis, but they left again to go to the store. Ms. Booker testified that she had "tonked out," or won a hand, and the defendant had not paid her approximately $20 as he was required to do in his role as the "house." Shawn Porter, who was also playing the game, began an argument with the defendant

because he was concerned that he was risking his money in the game but would not be paid if he won. The defendant called Mr. Porter a "punk," and Mr. Porter called the defendant a "b***h." The defendant left by the back door.

The victim returned during the defendant's absence and, having been told about the argument, told Mr. Porter not to call anyone names. The defendant returned shortly through the back door and stood at the table but did not play. The victim told the defendant to "go on and run your Tonk game. You all just get along in here because I've got kids in this house." The defendant responded by raising his shirt, pulling out a gun, and saying, "No. F**k this sh*t. People going to start respecting me around here." The defendant fired into the floor, and Ms. Booker ran upstairs to call 911. She heard three more shots and heard her daughter say from downstairs, "Nick, wake up. Nick, wake up." According to Ms. Booker, the defendant did not have a gun when he was playing the card game, but she acknowledged he did not pull up his shirt prior to the shooting. She identified the defendant's camouflage jacket, which was found at a nearby market, and her cell phone, which the victim had been using and which was recovered lying next to the victim. Ms. Booker testified that the defendant was aiming at the ground and the victim was sitting on the couch during the initial shot. However, Ms. Booker indicated on a floor plan of her home, which showed that the card table was near the back door and the couch near the front door, that the defendant had been next to the card table and had fired the initial shot not toward the couch but toward Mr. Porter, who was sitting opposite him, and the window behind Mr. Porter. Ms. Booker acknowledged that she and her acquaintances also occasionally played an unofficial lottery game but did not remember the defendant saying that he was leaving to claim money he had won through these means.

Shirley Jackson, another player, had known Ms. Booker and the defendant since their childhood. She testified that this was the defendant's first time to run the Tonk game. Ms. Jackson testified that the victim was sitting in a chair and Ms. Mills and Ms. Beckley were upstairs when she arrived. When the defendant ran out of money, Mr. Porter and the defendant got into a heated argument, but Ms. Jackson could not recall the particulars. During the argument, the victim was "trying to tell them to chill out." At the end of the argument, the defendant said, "I'm going to go get some money and come back." When the defendant returned, the victim, who had been in the kitchen, came back into the living room. The defendant came up to the card table, said, "What's up n****r?" and started shooting. Ms. Jackson testified he was "pretty much" talking to the victim, and there was a short pause before the defendant started shooting, but he did not stand by his chair. Ms. Jackson testified that when she heard the shots, she crawled under the table and escaped upstairs through the kitchen. On cross-examination, Ms. Jackson denied telling investigators that she had seen the defendant shoot towards the ground. Ms. Jackson did not see whether the defendant had a weapon during the initial argument with Mr. Porter.

Mr. Porter, a childhood friend of the defendant, testified that after sixteen years' service in the navy, he reestablished contact with the defendant through Ms. Booker. Mr. Porter stated that he left the navy in 2005 but did not see the defendant until "shortly after [the defendant] had been released from jail . . . – from the penitentiary," when he helped the defendant who, "just being released from prison . . . kind of needed assistance in getting around." Although the defense had previously requested the prosecution to instruct its witnesses to refrain from mentioning the defendant's imprisonment, there was no objection to this testimony. The defendant invited Mr. Porter to the card game. This was the first time Mr. Porter had seen the defendant run a game; the person running the game would get a portion of the profits and would set some rules.

The players – Mr. Porter, Ms. Booker, Ms. Jackson, and the defendant – arrived around 11:00 a.m., and a conflict developed less than an hour into play, when Ms. Booker won and was displeased that the defendant did not pay her. Mr. Porter testified that he intervened and told the defendant to give money to Ms. Booker. Mr. Porter was also upset that the defendant was trying to sit out for some of the game while still cutting the cards and also leaving a vacant seat. As they argued, the defendant said to Mr. Porter, "Quit crying[,] punk." Mr. Porter was offended and tried to give the defendant a chance to say he had been joking, but when the defendant did not, Mr. Porter said, "I ain't going to be too many more punks, b***h." The argument was loud enough that Ms. Beckley shouted from upstairs for the men to stop arguing in her mother's house. The defendant left the house by the back door. Mr. Porter testified that he did not recall the defendant saying he was going to get money when he left the residence. He did not know if the defendant had the gun prior to leaving.

The defendant was gone no more than five minutes, which would have been time for him to go to his grandmother's home, where he was staying. Mr. Porter testified that the game did not continue in the defendant's absence. The defendant knocked at the door and was asked inside. Mr. Porter was shuffling the cards and asked if the defendant was playing. The defendant did not answer, and the victim, who was in the same room with the players, rose from the couch and began to say, "[H]ey, if you all play, just stop arguing and get along." The defendant, who was standing with his hands on the back of his chair, responded by pulling a gun from his waistband and shooting at the floor in the direction of the victim. At the gunfire, Ms. Booker and Ms. Jackson fled, but Mr. Porter stayed still because he believed that, as he had been involved in the verbal altercation with the defendant, he might call attention to himself by moving. Mr. Porter testified he was "not too afraid because he's shooting in the floor." The victim fell and the defendant turned to Mr. Porter, pointed the gun at him, and told him to get up from the table. The defendant was forcing Mr. Porter to back towards the door and asked him to go outside, and Mr. Porter had his hands up and was trying to calm the defendant. Mr. Porter stood on his tiptoes to try to lower the range of any

-4-

potential wound so that he might survive. The defendant left through the back door.

On cross-examination, Mr. Porter confirmed that the defendant shot only at the floor. The victim had approached to within two or three feet of the defendant when the defendant fired. Mr. Porter testified that he recalled three or four shots and that the defendant never raised the gun but aimed at the floor the whole time.

Debra Mills testified that she had spent the previous night at Ms. Booker's home. Ms. Mills had known both the defendant and Ms. Booker for years. Ms. Mills testified that she did not play Tonk but was in the kitchen and heard a loud argument erupt when Mr. Porter called the defendant a "punk b***h." The defendant left through the back door at the end of the argument. The defendant returned through the same door after fifteen to twenty minutes. Ms. Mills testified that the victim had been on the couch when the defendant left and that the defendant confronted Mr. Porter when he returned. She heard the victim get up and tell the defendant that there was no need to argue and to just finish the card game. She then heard shots and went to the threshold of the living room. Ms. Mills saw the defendant shooting a gun, the victim lying by the closet door, and Mr. Porter sitting still while the others ran. Ms. Mills ran to the kitchen and then upstairs.

On cross-examination, Ms. Mills testified she heard the defendant say he would be back when he left but did not hear him say he would get money. Ms. Mills testified that the victim got up when he saw the defendant had a gun. However, she testified that she did not actually see the shooting but just heard it. Ms. Mills acknowledged having told police that she saw the defendant shoot the floor but testified that she only heard the three or four shots. She then stated that in her hurry to escape, she kept falling down the stairs and that she had seen the second shot from the stairway. The gun was pointed at the window. Ms. Jackson and Ms. Booker were already upstairs. Ms. Mills did not see a gun prior to the time the defendant left after the argument, but the defendant did not lift his shirt.

Nakia Beckley, Ms. Booker's daughter, testified that she had been in the shower during her mother's Tonk game when she heard arguing and that she shouted down the stairs that the guests should not keep coming to her mother's house every day arguing. Ms. Beckley went to her room, and a couple of minutes later, she heard a gunshot. She ran downstairs, passing Ms. Jackson and her mother on the steps and Ms. Mills at the bottom. The victim was lying down, and the screen door was shutting. On cross-examination, Ms. Beckley denied having told police that she saw the defendant fire a gun into the ground. She testified that she only heard the shots.

Jamar Gillis,[1] the victim's cousin, testified that Mr. Porter and the defendant were arguing over money in the card game. Mr. Gillis testified that he and the victim were sitting on the couch when Mr. Porter called the defendant a "b***h." Ms. Booker asked them to stop arguing. The defendant left by the back door and then returned the same way. He sat in his chair and began to play, and another argument began. Ms. Booker again asked for the argument to cease and then the victim politely asked everyone to calm down. The defendant jumped up, and he and the victim "square[d] off with a distance between each other" as "words [were] going back and forth with them." The victim had his fist balled up as though he wanted to fight. Mr. Gillis testified that the victim "was being a man wanting to put a fight up. And [the defendant] didn't want to do it . . . ." Mr. Gillis testified that the victim wanted to fight because the defendant was not being respectful of Ms. Booker's home. The defendant then drew his gun and pointed it at Mr. Gillis, who was still on the couch, while one shot went off. The defendant fired once at the ground. He fired again and hit the victim in the foot. He fired one last time, killing the victim by shooting him in the head. At the time he fired the gun, the defendant was standing closer to the front door, and the victim had moved between the defendant and the back door, where the card table was. The victim was bleeding from a wound by his eye, and the defendant moved over to Mr. Porter, pointing the gun at his head. He then lowered his hand and walked out of the door.

On cross-examination, Mr. Gillis acknowledged that he loved his cousin and that his cousin was a large man. He testified that "you could be scared of him. About his weight." He agreed the defendant was smaller than the victim and had weighed even less at the time of the shooting. Mr. Gillis testified that the victim and defendant were talking and were "in the position to fight" within arm's reach of each other. He denied that the victim grabbed his cell phone but acknowledged that he died with a cell phone in his hand. He testified he did not see the defendant backing up and denied telling investigators that the victim and defendant were rotating around each other.

Michael Mays, the record keeper for Knox County Emergency Communications, testified that there were two 911 calls regarding the shooting, the first coming in at 1:25 p.m. The first call reported that someone had been shot in the head. Ten minutes later, a call reported that someone had run into a nearby market, taken off a camouflage shirt, and thrown it down, yelling that he needed a ride.

Andrew Boatman, an investigator with the Knoxville Police Department, arrived at around 1:30 p.m. and found the victim lying on his back and bleeding. Investigator Boatman testified that there was a market located about six or seven hundred yards from Ms. Booker's

---

[1]Jamar Gillis and the victim share the same last name. This opinion will use "Mr. Gillis" to refer to Jamar Gillis and "the victim" to refer to Nicholas Gillis.

residence, that the second 911 call had originated there, and that the police found a discarded shirt at the site. Three days after the shooting, Investigator Boatman executed a search on the defendant's grandmother's home, which was two hundred yards from the market, and found some of the defendant's personal effects and a Makarov pistol which did not match the caliber of the casings at the crime scene. The police released a wanted bulletin to the local media. On February 9, 2007, based on an anonymous tip, Investigator Boatman found the defendant hiding at the home of a relative.

Investigator Boatman testified that Ms. Jackson told him that she only saw the defendant fire one shot and that he fired into the ground. He also testified that Ms. Beckley told him that she saw the defendant fire into the ground. The abandoned camouflage shirt was tested, and no blood was present.

Russell Whitfield of the Knoxville Police Department's forensic unit testified that he processed the crime scene and took video and photographs. Officer Whitfield found three shell casings, two in a pool of blood at the victim's head, and one near a glass table. He also recovered a bullet fragment and jacket. The victim had a cell phone in his left hand, and a cell phone was found above the victim's right shoulder. The victim was lying on his back with his feet toward the front door. A double-paned window in the living room near the card table had a hole in it, and Officer Whitfield testified that he believed the bullet which went through it had come from eye level. He testified he only found one spot where a bullet had made a divot in the concrete floor.

Officer Whitfield testified that the casings would indicate exactly three shots were fired from the gun. He acknowledged that a 9mm would be powerful and a ricocheted bullet from it could be deadly. He acknowledged that the victim's body was not directly lined up with the window, which one bullet had penetrated. He testified that the round that went out the window was not recovered, and one bullet with the jacket intact was recovered from the victim's body.

Dr. Darinka Mileusnic-Polchan, the chief medical examiner for Knox County, testified that the previous chief medical examiner had performed the autopsy. The victim had three main wounds. One bullet had entered his head between his eye and nose and severed his brain stem, resulting in his death. Dr. Mileusnic-Polchan testified that the bullet's trajectory went slightly from the right to the left, but it did not go up or down. This bullet was recovered at the autopsy. Another bullet passed in and out of the victim's inner lower leg, from front to back, at a downward angle, and a third bullet grazed above the elbow on the victim's right arm, moving from front to back at a level trajectory. Dr. Mileusnic-Polchan testified that the shot to the face was fired from about three feet from the victim and that the presence of stippling and gunpowder residue, as well as the straight trajectory and regularity

of the entrance wound, indicated that it was not a ricocheted shot. The absence of soot and stippling on the victim's jacket indicated the gun was further than three feet away when the victim was shot in the arm.

The defendant took the stand in his own behalf. The defendant testified that he had won "the number board," a lottery game apparently run by acquaintances, the night before the shooting and that he anticipated receiving money from it. The morning of the shooting, he got a call from Ms. Booker, with whom he played cards every day, about the card game, and, although he had other cash, the defendant decided to take smaller bills totaling around two hundred dollars to run the game. The defendant also expected that he would get his lottery winnings at Ms. Booker's house. The defendant testified that his grandmother was not permitted to have an extra person living in her home, and he took a nine millimeter gun with him as part of an effort to keep his possessions hidden or out of the house in case of inspection. The defendant testified that he found out at the card game that he would have to wait until noon to get his winnings from the lottery.

About thirty minutes into the game, the defendant had lost the money he had brought. Ms. Booker won twice, and the defendant then owed her $60. The defendant and Mr. Porter then got into an argument, and Mr. Porter said, "F-U b***h." Nothing else was said, and the defendant left to get more money because he knew that Mr. Porter would not allow him to play the next game without cash. The defendant went to his grandmother's house for ten to fifteen minutes and grabbed all of his money. The defendant returned to Ms. Booker's, knocked on the locked door, and was let inside. Ms. Jackson, Ms. Booker, and Mr. Porter were in the middle of a hand, and the defendant stood behind the chair he had previously occupied, waiting for an opportunity to join the game.

The defendant had his hands on the back of the chair and the gun still in his waistband when the victim got up from the couch and approached him. The defendant testified that the victim said, "[Y]'all need to hold it down at this game, man, y'all both acting like b***hes. You need to quit acting like a b***h. You just been released from prison. That's where you're supposed to be big homey . . . . You're acting like a b***h."

The defendant testified that the victim was walking toward him and getting louder and gesticulating. The defendant felt threatened and afraid and turned to face the victim when the victim was very close. The defendant testified that he told the victim to quit talking to him and said, "Back up off me," when the victim was about two feet away. The defendant's chair had been in front of the entrance to the kitchen, and, as the victim moved between him and the kitchen, the defendant started to back away toward the front door, which was closed and locked. The defendant pulled out his weapon and shot the floor and told the victim to back up again. Everyone began to run, but the victim continued to approach. The victim had

his arms up and was reaching for the defendant and the gun. The defendant thought the victim, who was the larger man, was going to attack him, and he kept backing up. The defendant testified that, as the victim continued to come, he "shot around" the victim, towards the back door. The victim continued to come, and the defendant was afraid that the victim would disarm him and attack him with his own weapon. He testified that he also thought he saw the victim reach for a weapon and that he believed the victim would kill him if the victim had a gun. The defendant testified that he had only known the victim for two months and that he had heard the victim had committed robbery and would shoot. The defendant testified he fired the gun three times and, on the third shot, he saw the victim fall. He testified that he did not intend to shoot the victim but was "shooting around him" to get him to back up and because he saw him reach for a weapon with his left hand. The defendant spoke the victim's name, then started to leave by the back door. Mr. Porter was standing by the back door as though about to exit. He was blocking the door, and the defendant told him to move. He said to Mr. Porter, "look what you started," told him to move again while waving the weapon, and left. The defendant ran to his grandmother's house and told her he loved her. Then he went out, took off the camouflage shirt he had been wearing, and went into the market asking for a ride. The defendant testified he had been in a car accident when he was fifteen and had sustained a head injury that resulted in a coma.

On cross-examination, the defendant acknowledged three prior drug felony convictions in 1991, 1993, and 1996, and he acknowledged that he knew he was barred from firearms possession. He testified that, in the two months he had been out of prison in January 2007, he had acquired the nine millimeter gun "off the streets," and had confiscated the Makarov from his nephew. He denied being angry with Mr. Porter or calling Mr. Porter a punk during the argument. He testified that he had the gun in his pants from the time he left his grandmother's house in order to remove it from the house, and he testified that the reason he did not take the Makarov which was hidden in the couch was that he had lost track of it and did not know where it was. The defendant said that he threw the weapon used in the shooting into some bushes from a moving vehicle. The defendant also testified that the front door of the home was not in use, that he had his back to it the whole time, and that he felt trapped. He acknowledged that he fled the scene. He denied hiding in a closet when he was apprehended, however, relating that he was in bed under the covers and that Investigator Boatman was not the arresting officer.

The prosecutor questioned the defendant about Jamar Gillis's testimony. The defendant acknowledged having been housed with Mr. Gillis during the trial, but he denied threatening Mr. Gillis in order to get him to testify that the victim was coming at him in a threatening manner.

The jury convicted the defendant of the lesser-included offense of second degree

murder and convicted him of aggravated assault and weapons possession as charged.

At the sentencing hearing, the defense called Dr. Eric Engum, a clinical psychologist who specializes in clinical neuropsychology, to testify regarding a head injury that the defendant sustained when he was fifteen years old. The defendant was thrown from the back of a truck and suffered a fracture of his skull and a severe concussion. Dr. Engum testified that the defendant's verbal IQ and verbal memory were significantly lower than his performance IQ and visual memory, indicating his left brain, which controls verbal comprehension and reasoning, was impaired. He testified that the defendant would be more volatile and impulsive than a person without such a brain injury and that he would be more likely to interpret a non-threatening situation as threatening. He testified that the defendant's ability to evaluate information rationally would always be impaired, but there might be medications to make him less aggressive and volatile.

The trial court sentenced the defendant as a Range II offender to thirty-five years for the second degree murder conviction. The trial court enhanced the murder sentence beyond the minimum based on the defendant's criminal history beyond that necessary to establish the range; on the defendant's use of a firearm; and on the finding that the defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(1), (9), (10) (2007). The trial court applied as a mitigating factor the defendant's childhood head injury. The defendant was sentenced to the minimum in his range of six years for the aggravated assault, but the trial court enhanced the weapons possession sentence to the maximum within the range, four years. While the trial court did not explicitly state that the defendant's prior criminal history was the factor it relied upon to enhance the weapons possession conviction, its contemporaneous reference to the defendant's prior convictions in regard to the enhancement of the aggravated assault indicates that it based the decision on the defendant's previous history of criminal behavior above that necessary to establish the range. In the order denying the motion for a new trial, the trial court clarified that it had used the defendant's criminal history as enhancement. The trial court also considered the defendant's trial testimony, which the court summarized as indicating the defendant's belief that "you just have to have a gun."

The trial court then ruled that the aggravated assault sentence should be served consecutively to the murder sentence. The court relied on Dr. Engum's testimony to conclude that the defendant was a dangerous mentally abnormal person so declared by a competent psychiatrist and also concluded that the defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40-35-115(b)(3) & (4). The trial court noted that the dangerous offender finding was supported by the aggravated circumstances of the crime, in which "there was . . . just a minor confrontation

in a card game and the man goes and arms himself, comes back, and the first time – the first thing somebody says cross to him, he used deadly force and killed a man." The trial court went on to find that extended confinement was necessary to protect society from the defendant, who was not able to improve the impulsive behavior caused by his head injury. The trial court concluded that the aggregate length of the sentence was reasonably related to the offense.

The defendant moved for a new trial, alleging various grounds including that the evidence was insufficient to support the verdict; that the trial court had erred in permitting the defendant to be impeached with his prior drug convictions; and that the trial court erred in imposing consecutive sentences. The trial court denied the motion, finding that the evidence was sufficient to sustain the verdict. The trial court acknowledged that it had erroneously stated that it did not have to weigh the probative value and prejudicial effect of the defendant's prior felonies. However, the trial court, while not referencing the portion of the transcript where it had previously corrected this mistake, noted that it had in fact heard the parties on the issues of the probative value and prejudicial effect of the evidence, and had concluded that the crimes of drug trafficking were crimes of dishonesty and were not similar to the crimes for which the defendant was on trial, and that the probative value therefore outweighed any prejudice. The trial court also acknowledged that it had erred in relying on Dr. Engum's testimony because he was not a psychiatrist and he had not testified to all the required findings that the defendant's criminal conduct was characterized "by a pattern of repetitive or compulsive behavior with heedless indifference to consequences." T.C.A. § 40-35-115(b)(3). However, the trial court concluded that consecutive sentencing was supported by the finding that the defendant was a dangerous offender, and it reiterated its findings at the sentencing hearing.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant does not argue that the evidence was insufficient to support his convictions for possession of a firearm and for aggravated assault but asserts that the jury could not have found he engaged in a knowing, as opposed to a reckless, killing because of the testimony that the defendant was aiming the gun at the ground when he fired it.

"Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In evaluating the sufficiency of the evidence, the appellate court must determine "whether, considering the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). The prosecution is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). All factual issues raised by the evidence, including questions regarding the credibility of witnesses and the weight and value of the evidence, are resolved by the trier of fact, and the appellate court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Evans*, 108 S.W.3d 231, 236-37 (Tenn. 2003). A guilty verdict replaces the presumption of innocence with a presumption of guilt, and the defendant bears the burden of showing that the evidence was not sufficient to support the verdict. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010).

The defendant was convicted of second degree murder, a "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). The defendant was also convicted of aggravated assault. In this case, the State had to prove beyond a reasonable doubt that the defendant intentionally or knowingly caused Mr. Porter to reasonably fear imminent bodily injury while using or displaying a deadly weapon. T.C.A. §§ 39-13-102(a)(1)(B), -101(a)(2). The defendant was further convicted of possession of a handgun, having been previously convicted of a felony drug offense. T.C.A. § 39-17-1307(b)(1)(B).

The proof at trial established that the defendant became involved in an argument with Mr. Porter regarding the card game, left the apartment, and then shortly returned. While there were discrepancies in the witnesses' testimony regarding exactly how the shooting took place, it is the province of the jury to resolve any conflicts in testimony. Ms. Booker testified that the defendant initially shot at the floor, and Mr. Porter testified that the defendant never raised the gun but aimed all of the shots at the floor. Investigator Boatman testified that Ms. Jackson and Ms. Beckley told him the defendant had fired toward the ground. However, both Mr. Gillis and the defendant testified that the gun was not aimed at the ground for all three shots. The defendant's own testimony was that he was trying to "shoot around" the victim for the second and third shots. The forensic evidence indicated that the fatal shot had been fired from about three feet away and had not ricocheted but was fired directly at the victim's head. There was only one divot in the concrete floor, and a double-paned window had been shot with what Officer Whitfield described as an eye-level trajectory. We conclude that a rational trier of fact could have concluded that the defendant was aware that his

conduct in shooting at the victim's face from about three feet away was reasonably certain to cause the victim's death.

The defendant then pointed the gun at Mr. Porter, who testified he was still seated. The defendant's testimony was that he "waved" the gun in the direction of Mr. Porter to get him to move because he was blocking the door, but Mr. Porter testified that the gun was pointed at him as he attempted to calm the defendant, who had ordered him to get up, and that he was trying to stand on his toes so that the shot, if it came, might not be fatal. The defendant's testimony acknowledged his possession of both that weapon and another found at his grandmother's home. We conclude the evidence was sufficient to support the convictions.

## II. Impeachment With the Defendant's Prior Convictions

The defendant next argues that the trial court improperly allowed the defendant's prior felony drug convictions to be used as impeachment based on a finding that drug crimes were probative of the defendant's honesty. The defendant cites *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003), for the proposition that drug crimes do not involve dishonesty or false statement, and he asserts that the introduction of this evidence was highly prejudicial because drug crimes are associated with violence and a general criminal disposition relevant to intent. The State argues that the trial court did not err because, although the prior convictions had limited probative value, they were also not prejudicial because they were not similar to the crimes with which the defendant was charged. Furthermore, the State asserts that any error was harmless.

Under Tennessee Rule of Evidence 609, prior crimes may be used to attack a witness's credibility under certain circumstances. The crime itself must be punishable by death or imprisonment in excess of one year or involve dishonesty or false statement. Tenn. R. Evid. 609(a)(2). If the witness to be impeached is a criminal defendant, the State must give written notice of its intent to use the prior convictions. Tenn. R. Evid. 609(a)(3). Furthermore, for criminal defendants, the trial court "upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." *Id.* The trial court must make this ruling prior to the defendant's testimony. *Id.* This particular balancing test is applied to convictions which are not stale. *See* Tenn. R. Evid. 609(b).

A trial court's decisions regarding the admissibility of prior convictions are reviewed for an abuse of discretion. *Waller*, 118 S.W.3d at 371; *State v. Lankford*, 298 S.W.3d 176, 180 (Tenn. Crim. App. 2008). An abuse of discretion occurs when a trial court applies an incorrect legal standard or reaches a decision which is illogical or unreasonable and causes

an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). However, if the trial court fails to engage in the procedurally required weighing of the evidence, its decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court. *Lankford*, 298 S.W.3d at 181-82. The appellate court must then independently determine the admissibility of the evidence. *Id.* at 182. "A procedural claim under Rule 609 challenges the process the trial court utilized to reach its decision, rather than the decision itself; however, a substantive claim under this rule challenges the trial court's weighing of the probative value against the unfair prejudicial effect as well as the resulting decision to admit or exclude the prior conviction." *Id.* at 181.

In weighing the probative value and the prejudicial impact of the prior convictions, the trial court must particularly consider two criteria: (1) the relevance of the prior conviction to the defendant's credibility; and (2) the similarity of the prior conviction to the crime for which the defendant is on trial. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). While any felony may be "generally probative" of the defendant's credibility, not all felonies are therefore admissible. *Waller*, 118 S.W.3d at 371. Instead, the trial court must determine the degree to which the felony conviction is probative of credibility by analyzing whether it involves dishonesty or false statement. *Id.* Furthermore, "evidence of convictions for the same type of crime should be admitted sparingly because of the impression on jurors that if a person committed a crime in the past, he committed the offense for which he is on trial." *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012).

In *State v. Waller*, the Tennessee Supreme Court rejected the contention that prior drug convictions involve dishonesty or false statement within the meaning of the Rule. *Waller*, 118 S.W.3d at 371. The Court concluded that "prior felony drug convictions are, at best, only slightly probative of [the defendant's] credibility." *Id.* at 373. Numerous drug convictions, however, increase the probative value on the issue of credibility. *State v. Walker*, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999) ("However, five previous felony convictions are more probative on the issue of the defendant's credibility than would be a fewer amount. One can more readily infer that the defendant has a disregard for the law that would include not testifying truthfully."). Because the convictions in *Waller* had "some relevance" to credibility, the Court went on to analyze the similarity of the offenses to the charged crimes, concluding that their substantial similarity was prejudicial and the admission of the evidence was error. *Waller*, 118 S.W.3d at 373-74.

Here, the trial court initially refused to balance the probative value of the evidence with the unfair prejudicial effect. However, the trial court subsequently *sua sponte* corrected its mistake. Regarding the previous weapons conviction, the trial court found that it was too similar to the crimes for which the defendant was on trial and excluded it from the evidence. The trial court then found that the drug convictions were crimes of dishonesty and relevant

to the defendant's credibility.[2]

The State sought to impeach the defendant with three felony drug convictions. Contrary to the trial court's finding, drug offenses are not crimes of dishonesty and therefore only marginally probative of credibility. *Waller*, 118 S.W.3d at 373. Multiple drug convictions are, however, more probative of credibility than a single conviction. *Walker*, 29 S.W.3d at 891. In this instance, the unfair prejudicial effect was limited by the dissimilarity of the convictions from the charged crimes. Prior decisions of this Court have upheld impeachment with a prior drug conviction where the accused was on trial for dissimilar crimes. *See State v. Chism*, No. W2001-01287-CCA-R3-CD, 2002 WL 31624946, at *12 (Tenn. Crim. App. Nov. 8, 2002) (affirming admission of drug convictions which were "not without probative value" and dissimilar from crimes at trial); *State v. Dooley*, 29 S.W.3d 542, 554 (Tenn. Crim. App. 2000) (upholding admission of drug convictions as probative of credibility where crimes for which defendant was on trial were dissimilar); *State v. Binion*, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996) (allowing impeachment with drug conviction and concluding, without discussion, that it was probative of credibility); *State v. Tune*, 872 S.W.2d 922, 927 (Tenn. Crim. App. 1993) (probative value outweighed prejudicial effect where drug convictions were not similar to crimes at issue). We note that *Waller*'s conclusion that drug convictions have only slight probative value regarding witness credibility might have resulted in a different outcome in balancing the prejudicial and probative value of the evidence in some of these cases; these decisions may, contrary to the holding in *Waller*, have relied on a conclusion that drug offenses involve dishonesty. *See State v. Knighton*, No. E2000-00746-CCA-R3, 2001 WL 125952, at *6-7 (Tenn. Crim. App. Feb. 15, 2001) (holding that the drug trade by "its very nature involves a sustained intent to violate the law and the use of deceptive practices").

Nevertheless, we conclude that, although the trial court incorrectly found that the drug offenses involved dishonesty, it did not abuse its discretion in admitting multiple drug convictions which were dissimilar from the charged offenses. Although the evidence was not highly probative of credibility, neither was it particularly prejudicial. The number of prior drug convictions adds to the probative value of the evidence. Insofar as the defendant's

---

[2]Although the trial court explicitly made findings regarding the similarity of the weapons conviction to the crimes at issue, it did not explicitly state that the drug crimes were not similar to the charged offenses. However, it is clear from the record, as well as from the trial court's contemporaneous decision to exclude the weapons convictions on the basis of similarity, that the trial court considered this factor. The trial court noted in the order denying the motion for a new trial that it had found the convictions were not similar to the crimes for which the defendant was on trial. There were no allegations that drugs were in any way involved in the shooting incident. Accordingly, we review the decision for abuse of discretion. *See Waller*, 118 S.W.3d at 373 (noting that trial court did not explicitly state that crimes were similar but reviewing for abuse of discretion); *but see Lankford*, 298 S.W.3d at 181-82.

challenge is to any procedural irregularity, we conclude that the trial court properly considered and weighed the two relevant factors outlined by *Mixon*. *See Mixon*, 983 S.W.2d at 674.

Regardless, the admission of prior convictions whose probative value is outweighed by the danger of unfair prejudice is subject to harmless error analysis. *Waller*, 118 S.W.3d at 374. An error by the trial court does not require relief unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). In *State v. Lankford*, the trial court allowed impeachment with a prior burglary conviction, which was identical to the crime for which the defendant was on trial. *Lankford*, 298 S.W.3d at 180. This Court concluded that because such a crime was highly probative of credibility, the admission was not in error. *Id.* at 182. However, because the Court concluded that the question was a close issue, it also conducted a harmless error analysis. *Id.*

In this case, the testimony of all the eye witnesses, including the defendant, established that the defendant shot the victim with a gun. Multiple witnesses, including the defendant, also testified that the defendant pointed a gun at Mr. Porter. The evidence of guilt was overwhelming. Even if the admission of the evidence was in error, its admission did not more probably than not affect the judgment. Tenn. R. App. P. 36(b). Furthermore, the testimony of Mr. Porter, as well as the defendant's testimony, referred to the defendant's recent release from prison. Although the defendant had requested the court to instruct the State's witnesses not to refer to the defendant's imprisonment, the defendant did not object when Mr. Porter gave the testimony. The defendant referred in his own testimony to his release from prison. We conclude that if the admission was in error, that error was harmless. *See State v. Summerall*, 926 S.W.2d 272, 277 (Tenn. Crim. App. 1995) (finding harmless error where evidence of one felony had already been admitted and impeachment was with a second felony) *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998) *as recognized by State v. Upshaw*, No. W1999-00777-CCA-R3-CD, 2001 WL 29456, at *8 n.1 (Tenn. Crim. App. Jan. 11, 2001).

### III. Consecutive Sentencing

The defendant next challenges the trial court's decision to run the aggravated assault conviction consecutively to the second degree murder conviction. The defendant argues that the record does not support the conclusion that the defendant's thirty-five-year sentence for second degree murder was insufficient to secure public safety without the consecutive six-year sentence for aggravated assault.

The decision to impose consecutive sentences rests within the sound discretion of the

trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010); *State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999); *see also State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (adopting an abuse of discretion standard of review for sentence length and giving a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of the Sentencing Act).

In order to impose consecutive sentencing, the trial court must find by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The trial court may properly impose a consecutive sentence upon the finding of just one of the criteria listed above. *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). Consecutive sentencing is also "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (citing T.C.A. §§ 40-35-102(1), -103(2)).

The State joins the trial court in conceding that the trial court's initial reliance on Tennessee Code Annotated section 40-35-115(b)(3), that the defendant is "a dangerous mentally abnormal person so declared by a competent psychiatrist" was in error, as Dr. Engum is a clinical psychologist and not a psychiatrist. However, the State asserts that the trial court's decision was supported by its finding that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high" under Tennessee Code Annotated section 40-35-115(b)(4).

Because no competent psychiatrist testified regarding the defendant's mental condition, the trial court's initial reliance on that criterion was misplaced. *State v. Hallock*, 875 S.W.2d 285, 295 (Tenn. Crim. App. 1993) (concluding that clinical psychologist's testimony did not satisfy statutory requirements); *State v. Swanson*, No. E1998-00041-CCA-R3-CD, 2000 WL 626778, at *6 (Tenn. Crim. App. May 16, 2000) (holding that reliance on psychologist's report was erroneous). The trial court, however, also found that the defendant's sentences should run consecutively because the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Because the criterion that the defendant is a dangerous offender is "the most subjective and hardest to apply," this category requires additional findings in order to support consecutive sentencing. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Evidence must also show that the sentence is reasonably related to the severity of the offense and necessary to protect the public from the defendant's further criminal activity. *Id.*; *but see State v. Clifton*, No. W2012-01651-CCA-R3-CD, 2013 WL 2297130, at *10 n.8 (Tenn. Crim. App. May 21, 2013) (questioning the "continuing vitality" of *Wilkerson*'s requirements for additional findings for the dangerous offender category in light of *Bise*).

In this case, the trial court found that the circumstances indicated that the defendant had little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The trial court relied on the fact that the homicide occurred as a response to a situation that was not particularly provocative; that the defendant, after a minor argument, intentionally armed himself before returning to the residence; that the defendant, apparently initially aggravated by the argument with Mr. Porter, responded with deadly force not to Mr. Porter but to the victim, the first person to confront him; and that the shooting occurred in a residence where there were seven persons present other than the defendant. *See State v. Maraschiello*, 88 S.W.3d 586, 610 (Tenn. Crim. App. 2000) (concluding that the record supported the finding that the defendant, who shot through the door and walls of his wife's trailer despite his knowledge that his children might be inside, was a dangerous offender); *State v. Cowan*, 46 S.W.3d 227, 236 (Tenn. Crim. App. 2000) (concluding the defendant, who shot multiple rounds into the home while the victim, his children, and his girlfriend were present, was a dangerous offender). The trial court found that the defendant's problems with impulse control necessitated extended confinement to protect the public from further violent acts. The trial court also noted that the circumstances were "aggravated" in that the shooting was a response to a minor verbal confrontation, and that the aggregate sentence was therefore reasonably related to the severity of the offense. We conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

## CONCLUSION

Because the evidence was sufficient to support the verdicts and because the trial court did not abuse its discretion in admitting the defendant's prior crimes or imposing consecutive sentences, we affirm the judgements of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE